UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,    )
                             )
            Plaintiff,       )
                             )
     v.                      )    No. 4:08CR712 RWS
                             )                (FRB)
YUSEF TAREEK STROUD,         )
                             )
            Defendant.       )

**MEMORANDUM**
**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

        All pretrial motions in the above cause were referred to
the undersigned United States Magistrate Judge pursuant to 28
U.S.C. § 636(b).  The defendant filed several pretrial motions.
Hearings were held on the motions.  The following findings of fact
and conclusions of law are made on the evidence and information
adduced at those hearings.

        1.    Defendant's Motion To Suppress Statements (Docket No. 19)

**Findings of Fact**

        On May 14, 2005, at about 8:00 p.m. Officers Daniel
Earley and Mike Scego of the St. Louis, Missouri, Police
Department, were on routine patrol in the vicinity of Vandeventer
and Lincoln Avenues in the City of St. Louis.  The officers were in
uniform and riding in a marked police vehicle.  Officer Scego was
driving and Officer Earley was a passenger.  As the officers were

-1-

driving east on Lincoln they heard what sounded like gunshots coming from a location to the east of where they were driving. They then drove in the direction from which the shots appeared to have come. Lincoln Avenue runs in an east west direction. As they were approaching the intersection of Lincoln and Prairie Avenues they saw a man running south on Prairie. The person ran across Lincoln in front of their vehicle and continued running south on Prairie. The officers then turned right onto Prairie in their vehicle and attempted to catch up to the runner. The man was running fast and appeared to be clutching the area of his waistband. They eventually caught up to the man as he ran on the sidewalk near a vacant lot in the 2600 block of Prairie. The man running was later identified as Yusef Tareek Stroud, the defendant here.

As the police vehicle drove parallel to Stroud, Officer Earley yelled for him to stop. Stroud turned and looked at Officer Earley. Stroud did not stop, but rather turned and ran west into the vacant lot. The officers then drove one block south on Prairie to the intersection of Cottage Avenue. They turned west on Cottage Avenue and drove to the alleyway that ran parallel to and behind the buildings on Prairie. The officers then turned north into the alleyway and drove a short distance. They then saw Stroud run out of the vacant lot area into the alley. Stroud then looked toward

the officers.  He then turned and ran back in the direction from which he had come.

At that point Officer Earley got out of the police car and began a foot pursuit of Stroud.  Officer Earley chased Stroud east through the vacant lot and across Prairie Avenue.  After crossing Prairie, Stroud ran into an east/west alleyway running between houses on Lincoln (to the north) and houses on Cottage (to the south).

Officer Earley gained ground on Stroud as they ran.  As Stroud ran through the alleyway he took off a gray T-shirt  that he was wearing over a white T-shirt.  Officer Earley initially thought that Stroud intended to throw the gray shirt aside in an effort to change his appearance.  However, Stroud did not cast the shirt aside.  Rather, as Stroud ran, it appeared to Officer Earley that he was attempting to roll something up in the gray T-shirt. Officer Earley then became concerned that Stroud might be attempting to conceal a weapon.  Officer Earley then drew his own firearm.

After running in the alleyway for some distance Stroud turned into a rear yard area at 3724 Lincoln.  Stroud ran toward Lincoln but encountered a six foot high wooden fence surrounding the yard area.  He attempted to climb over the fence.  As he did so he put his hands on the top of the fence.  At that point Officer Earley caught up to him.  Officer Earley then grabbed Stroud's left

shoulder and pulled him down from the fence.  As he did so he saw that Stroud was clutching the gray T-shirt in his right hand. Officer Earley saw what appeared to be the barrel of a pistol protruding from the T-shirt.  As Stroud came down off the fence he began turning toward Officer Earley and attempted to point the barrel of the gun at Officer Earley.  Officer Earley spun around behind Stroud in an effort to avoid having the barrel of the gun pointed at him.  Officer Earley then struck Stroud in the head with his firearm and Stroud fell to the ground.  Officer Earley then attempted to restrain Stroud but Stroud was able to get back up on his feet.  Stroud then lunged and threw the T-shirt and pistol over the wooden fence.  Officer Earley continued to struggle with Stroud.  Stroud fell and hit his head on the foundation of the building at that location.  By that time Officer Scego had arrived on the scene and he and Officer Earley were able to restrain and handcuff Stroud.

Officer Early then left Stroud with Officer Scego and went to the front of the building.  He was able to locate and seize the T-shirt and gun which Stroud had thrown over the fence.

Stroud was bleeding from head wounds suffered either when he fell to the ground and against the building or from the blow struck by Officer Earley.  An ambulance was called to the scene. Stroud was then transported to a hospital.[1]

---

[1]Government's Exhibit E is a photograph of Stroud as he appeared when placed in the ambulance.

In the meanwhile, other officers responding in the area found a man, Aaron Davis, shot dead in the 3700 block of Maffitt Avenue. This was approximately one and one half to two blocks north and east of the area in which Officers Earley and Scego had first seen Stroud running. When the officers first encountered Stroud he was then running in a direction away from the direction from which the shots had appeared to have been fired and from where the body of Davis was found.[2]

After being examined at the hospital, medical officials found Stroud fit for confinement and he was returned to police custody and was conveyed to the police station.[3]

Stroud was placed into an interview room. It was then about 3:30 a.m. Detectives Mathias Hanewinkle and Ralph Campbell of the St. Louis Police Department then entered the room and began an interview of Stroud. Prior to any questioning Detective Hanewinkle advised Stroud of certain constitutional rights by reading them to Stroud from a form. Specifically, he told Stroud that he had the right to remain silent; that any statement he made could be used against him at a trial; that he had the right to consult with counsel and to have counsel present with him during questioning if he wished; that he could retain counsel at his own

---

[2]Government's Exhibit A is an aerial photograph depicting the area in which these events occurred.

[3]Government's Exhibit G is a photograph of Stroud as he appeared at the police station after being released from the hospital.

expense or counsel would be appointed for him at no expense; that if he chose to answer questions without counsel present he could stop answering at any time; and that he could request counsel at any time during questioning. (<u>See</u> Government's Exhibit B). After being so advised Stroud said that he understood these rights but said that he would not sign the form. Stroud continued, however, to speak with the officers. He told them that he would tell them what had happened, but in exchange for his doing so he wanted an assurance that he could serve any sentence in federal custody. He said that he had served time previously in a federal facility and that they were better than state facilities. The detectives told Stroud that they were unable to make such agreements but that any request he made or information he gave would be passed on by them to prosecuting authorities. Stroud then offered an exculpatory statement and explanation of his encounter with the shooting victim.

The detectives then confronted Stroud with the information that he had been found in possession of a firearm. Stroud then made an acknowledgment that he was in trouble. He expressed concern for his young son. He then asked if he could place a telephone call to his father who resided out of state. He was allowed to do so. After speaking with his father on the telephone Stroud was placed back into the interview room. When the

detectives returned to continue the interview Stroud had fallen asleep.

The detectives then proceeded to do paperwork relating to the investigation and allowed Stroud to continue sleeping. About 45 minutes later they returned to the interview room and woke Stroud. It was then about 5:45 a.m.

Detective Hanewinkle then again advised Stroud of his rights by again reading them from the form (See Government's Exhibit B). Stroud then offered a statement different from the one he had earlier offered to the detectives. On this occasion Stroud said that he had been hired by someone to shoot the victim, but stated that he would not provide further details unless he received the agreement that he wanted. Stroud then signed the Advice of Rights and Waiver form. Stroud hand wrote on the form "I will provide details of Murder(s) when I get my deal in writting (sic)." (See Government's Exhibit B). Stroud also signed a form permitting the detectives to obtain a buccal sample from him for comparison testing. (See Government's Exhibit C).

At no time during the interviews did Stroud ask to speak with an attorney or state that he would not answer questions before speaking with an attorney. During the interviews by the officers the defendant was alert and coherent. His answers were appropriately responsive to the questions asked of him. His speech

was not slurred.  He did not appear to the officers to be in pain, nor did he complain to them of being in pain.

Officer Earley, Detective Hanewinkle and the defendant Yusef Tareek Stroud each testified before the undersigned at the hearing on the defendant's motion.  The defendant's testimony agreed in some respects with the testimony of the law enforcement officers, and differed in some respects.  Having had the opportunity to see and hear the witnesses and to consider matters reflecting on their credibility, the undersigned does choose to credit the testimony of the officers to the extent that it is necessary to resolve the discrepancies between the testimony of the witnesses in order to address and decide the issues raised in the defendant's motion.

## Discussion

As grounds to suppress the statements made by him the defendant asserts in his motion that the statements were the direct result of his unlawful arrest.  He claims that his arrest was unlawful because made without a warrant and without probable cause.

Law enforcement officers may detain an individual for a brief period of time if they have reasonable suspicion that criminal activity is afoot.  Terry v. Ohio, 392 U.S. 1, 30 (1968).  In order to detain a person in such circumstances, an officer must have "a particularized and objective basis" for suspecting criminal activity.  United States v. Jacobsen, 391 F.3d 904, 906 (8th Cir.

2004).  "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances."  United States v. Maltais, 403 F.3d 550, 554 (8th Cir. 2005), cert. denied, 546 U.S. 1177 (2006).  "While 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory [detention]."  United States v. Fuse, 391 F.3d 924, 929 (8th Cir. 2004).  In forming a basis for suspicion, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"  United States v. Ortiz-Monroy, 332 F.3d 525, 529 (8th Cir. 203) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)).  A number of factors, innocent in and of themselves, may give rise to a reasonable suspicion in the eyes of a trained law enforcement officer.  United States v. Barker, 437 F.3d 787, 790 (8th Cir. 2006).  During such a stop the officers may take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo while they attempt to confirm or dispel their suspicions.  United States v. Hensley, 469 U.S. 221 235 (1985).

Here while on patrol the officers heard shots fired in proximity to their location. They then saw the defendant running away from the direction and area in which the shots appeared to have been fired. These circumstances provided a particularized and objective basis for the officers to suspect that criminal activity might be afoot, that the defendant might be involved in such activity, and to detain the defendant. They were lawfully entitled to stop the defendant and to further investigate the matter.

However, when the officers caught up to the defendant and ordered him to stop running he ignored their command and continued to run and to take steps to evade the officers. Such acts by the defendant certainly strengthened the officers' suspicions regarding the defendant. In <u>Illinois v. Wardlaw</u>, 528 U.S. 119 (2000), the Supreme Court noted the significance of flight from officers in determining whether there is reasonable suspicion to stop a person.

> Our cases have . . . recognized that nervous, evasive behavior is a factor in determining reasonable suspicion. Headlong flight – wherever it occurs – is the consumate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.

<u>Id.</u> at 12.

"[Some] reactions by individuals to a properly limited <u>Terry</u> encounter, . . . such as flight, may often provide the necessary information, in addition to that which the officers already possess, to constitute probable cause." <u>Kolender v. Lawson</u>, 461

U.S. 352, 366 n.4 (1983) (Brennan, J., concurring). And "[o]f course, some reactions by individuals to [such a stop], _e.g._, violence toward a police officer, in and of themselves furnish valid grounds for arrest." _Id._

Police officers may lawfully arrest a suspect without a warrant if they have probable cause to believe that the person is committing or has committed an offense. _United States v. Watson_, 423 U.S. 411 (1976); _Gerstein v. Pugh_, 420 U.S. 103 (1975). Probable cause for an arrest exists when officers making an arrest have facts and circumstances within their knowledge sufficient to warrant a prudent man in believing that the person arrested had committed or was committing an offense. _Beck v. Ohio_, 379 U.S. 89, 91 (1964). Probable cause is a "fluid concept - turning on the assessment of probabilities in particular factual contexts - not readily, or even usefully, reduced to a neat set of legal rules." _Illinois v. Gates_, 462 U.S. 213, 232 (1983). "[O]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." _Spinelli v. United States_, 393 U.S. 410, 419 (1969). Based on their law enforcement training and experience police officers may draw reasonable inferences of criminal activity from circumstances which might seem merely innocuous to others not so trained and experienced. _United States v. Wajda_, 810 F.2d 754, 758 (8th Cir. 1987). In determining whether probable cause for a warrantless arrest existed in a

particular case the court must consider the totality of the circumstances, known to the officers involved in the investigation. United States v. Bubis, 744 F.2d 61, 64 (8th Cir. 1984).

As noted above there was objectively reasonable suspicion to support a lawful stop of the defendant before he fled. The defendant's flight in such circumstances constituted a violation of Missouri law. Section 575.150.1, Missouri Revised Statutes provides that,

> A person commits the crime of resisting or interfering with arrest, detention, or stop if, knowing that an officer is making an arrest, or attempting to lawfully detain or stop an individual or vehicle, or the person reasonably should know that a law enforcement officer is making an arrest or attempting to lawfully detain or lawfully stop an individual or vehicle, for the purpose of preventing the officer from effecting the arrest, stop or detention, the person: (1) Resists the arrest, stop or detention of such person by using or threatening the use of violence or physical force or by fleeing from such officer.

Also, as Officer Earley chased the defendant it appeared that the defendant was trying to conceal something within a rolled up T-shirt. When Officer Earley eventually caught up with the defendant he could see the barrel of a firearm protruding from the T-shirt. As the defendant and Officer Earley struggled the defendant attempted to point the barrel of the weapon toward

Officer Earley. Section 571.030.1, Missouri Revised Statutes provides that,

> A person commits the crime of unlawful use of weapons if he or she knowingly:
>
> (1) Carries concealed upon or about his person . . . a firearm or
>
> . . .
>
> (3) Exhibits, in the presence of one or more persons, any weapon readily capable of lethal use in an angry or threatening manner.

Officer Earley had probable cause to believe that the defendant had committed each of these offenses in his presence and therefore had probable cause to arrest the defendant. The arrest of the defendant here, made upon probable cause, was lawful, and any statements made by him were not the result of an unlawful arrest.

The defendant asserts also that any statements made by him to law enforcement officials should be suppressed because he was not advised of his constitutional rights before interrogation began; that interrogation did not cease when he indicated that he wished to remain silent; that he wished to speak to a lawyer before answering questions and to have a lawyer present during questioning. These claims are not supported by the credible evidence adduced at the hearing.

In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Supreme Court held that before questioning a person in custody law

enforcement officials must advise the person that he has the right to remain silent; that any statements he makes may be used against him at trial; that he has the right to have an attorney present during questioning; and that if he cannot afford an attorney one will be appointed for him. <u>Id.</u> at 478-79. The officials may question the person after so advising him if the person voluntarily, knowingly and intelligently waives these rights and agrees to answers questions put to him by the officials. Absent such advice and waiver, statements obtained through interrogation of a person in custody are not admissible against the person at trial. <u>Id.</u> at 479.

Evidence adduced at the hearing shows that the defendant was advised of these rights as required by <u>Miranda</u>, and after being so advised, said that he understood them. He then proceeded to make statements to the officers relating to the matters under investigation. At no time did the defendant say that he did not wish to speak with the officers, or that he wished to speak with a lawyer before answering questions or that he wished to have a lawyer present during questioning. Rather, the defendant chose to make statements, although stating the he did not wish to provide further details unless certain promises could be made to him. Thus, the defendant chose to speak in a selected fashion and there was no violation of his <u>Miranda</u> rights. <u>Connecticut v. Barrett</u>, 479 U.S. 523, 529-30 (1987); <u>Crespo v. Armontrout</u>, 818 F.2d 684,

686 (8th Cir. 1987).  The fact that the defendant chose to make

such statements, and the manner in which he did so, demonstrates

that he knowingly, voluntarily and intelligently waived his right

to remain silent and to counsel.  This is so even though the

defendant refused, initially to sign the written waiver form.

> The fact that the defendant did not sign
> the waiver form does not, per se, defeat the
> validity of a waiver of constitutional rights;
> the holding in <u>Miranda v. Arizona</u> requires
> that a waiver of rights be made voluntarily,
> knowingly and intelligently, but does not
> demand that it be made in writing.
>
> A voluntary waiver need not assume any
> particular form; it may be made in writing on
> a printed format or it may be made orally by
> replying to questions as in this case.  A
> valid waiver of rights does not require an
> express declaration to that effect; nor does
> lack of such a declaration necessarily
> indicate a defendant's desire to remain
> silent.  The validity of a waiver is to be
> determined from all of the surrounding
> circumstances.
>
> When the circumstances indicate that a
> defendant knew of his right to remain silent
> and to have counsel, yet intelligently waived
> that right by voluntarily answering questions,
> his refusal to sign a written waiver does not
> render a confession or an incriminating
> statement inadmissible.

<u>United States v. Zamarippa</u>, 544 F.2d 978, 981 (8th Cir. 1976);

<u>cert. denied</u>, 429 U.S. 1111 (1977). (Internal citations omitted).

<u>See</u> <u>also</u>, <u>North Carolina v. Butler</u>, 441 U.S. 369, 374-75 (1979).

The defendant claims that any statements made by him were not voluntary in that they were the result of coercion, duress, force, intimidation, threats and promises by the interrogating officers.

In considering whether a confession was voluntary, the determinative question is whether the confession was extracted by threats, violence, promises (express or implied), such that the defendant's will was overborne and his capacity for self-determination was critically impaired. Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir. 1988) (citing Culombe v. Connecticut, 367 U.S. 568, 602 (1961)). This determination must be made by looking at the totality of the circumstances, including the conduct of the law enforcement officials and the defendant's capacity to resist any pressure. United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990), cert. denied, 502 U.S. 829 (1991). "Obviously, interrogation of a suspect will involve some pressure because its purpose is to elicit a confession." United States v. Astello, 241 F.3d 965, 967 (8th Cir.), cert. denied, 533 U.S. 962 (2001). However, there must be some showing that the officers engaged in some coercive conduct to overbear the will of the defendant. Id. "Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'". Colorado v. Connelly, 479 U.S. 157, 167 (1986).

There is no credible evidence before the court that the officers engaged in any coercive behavior such as would overbear the defendant's will. No threats or promises were made to the defendant by the officers. When the defendant attempted to elicit promises from the officers in exchange for his statements he was specifically told that they could make no such promises. He was simply told that any request he made or anything he told the officers would be passed on by them to prosecuting authorities. Such an assurance by the officers does not render a defendant's statement involuntary. United States v. Judon, 472 F.3d 575, 581 (8th Cir. 2007) (rev'd on other grounds); United States v. Mendoza, 85 F.3d 1347, 1350 (8th Cir. 1996).

The evidence shows that the officers fully advised the defendant of his Miranda rights and that the defendant said that he understood these rights and then answered questions of the officers. "Cases in which a defendant can make a colorable argument that a self incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." Berkemer v. McCarthy, 468 U.S. 420, 423 (1984). "The fact that such warnings were given weighs in favor of a voluntariness finding." United States v. Mendoza, 85 F.3d 1347, 1350 (8th Cir. 1996).

Although the defendant was injured during his initial encounter with the officers, he was thereafter treated at a

hospital and released to police custody shortly thereafter.  The
defendant during his subsequent interviews by the officers was
alert and coherent.  His answers were appropriately responsive to
the questions asked of him.  His speech was not slurred.  He did
not appear to the officers to be in pain, nor did he complain to
them of being in pain.  Nothing about the defendant's physical
condition was of such consequence as would impair his ability to
resist any pressure put upon him to make any statements.  United
States v. Martin, 369 F.3d 1046, 1056 (8th Cir. 2004).

    At the time of the occurrences in question the defendant
was approximately 26 years old.  During his testimony at the
hearing he appeared to the undersigned to be at least of average
intelligence.  At the time of his arraignment in this cause he
stated that he was attending college.  The evidence before the
court also shows that the defendant at the time of the occurrences
in question had prior experience and familiarity with the criminal
justice system.  These factors also tend to show that the
defendant's will was not overborne.  United States v. Gaddy, 532
F.3d 783, 788-89 (8th Cir. 2008); United States v. Astello, 241
F.3d 965, 968 (8th Cir.), cert. denied, 533 U.S. 962 (2001); United
States v. Gallard-Marquez, 253 F.3d 1121, 1123 (8th Cir.), cert.
denied, 534 U.S. 1031 (2001).

    At one point during the interview the defendant asked to
place a telephone call to speak with his father who resided in

another state.  The officers then interrupted the questioning and permitted the defendant to call and speak with his father.  The fact that the defendant made such a request, and that the request was granted, is further indication that his will was not overborne.

Although the defendant may have been tired at the time of the interviews, as evidenced by his falling asleep when left alone at one point, such fatigue in and of itself would not show that he was unable to resist any pressure upon him to make any statements. United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990); United States v. Petary, 857 F.2d 458, 460-61 (8th Cir. 1988).

Perhaps the most telling evidence showing that the defendant's will was not overborne during the interviews was his own handwritten statement on the Advice of Rights/Statement form, "I will provide details of murder(s) when I get my deal in writting (sic)".  This statement demonstrates that the defendant was making choices as to what he would or would not say, and setting out the terms on which he would provide information.  In such circumstances it could hardly be said that he had lost the will to resist any pressures being put upon him by the officers.

The totality of these circumstances demonstrate that the defendant's statements to the officers were voluntary.

## Conclusion

For all of the foregoing reasons the defendant's Motion To Suppress Statements should be denied.

2.  <u>Defendant's Motion To Dismiss</u> (Docket No. 41)

The defendant moves to dismiss the pending indictment. The defendant asserts five grounds in support of his motion as follows:

> 1.  The Indictment Should be Dismissed Because the Prosecution of this Case is Vindictive for Defendant's Assertion of his Legal Rights in his Civil Rights Case under 42 U.S.C. § 1983;
>
> 2.  The Indictment Should be Dismissed as the Federal Prosecution is Merely a Sham for State Prosecution Because the State Failed to Obtain a Conviction on the State Charges and it is Retaliatory for Defendant's Prosecution of his Civil Rights Case in Adding the Board of Police Commissioners of the City of St. Louis as a Party to Said Case;
>
> 3.  The Indictment Should be Dismissed as the Federal Government has violated its own Petite Policy;
>
> 4.  The Indictment Should be Dismissed Because it Violates Defendant's Constitutional Rights Under the Double Jeopardy Clause in the Fifth Amendment to the Constitution; and
>
> 5.  The Indictment Should be Dismissed Because Collateral Estoppel Bars Relitigation of the Issue of Whether Defendant Possessed a Gun as he was Acquitted on the Charge of Armed Criminal Action.

(<u>See</u> defendant's Memorandum Of Law In Support Of Defendant's Motion To Dismiss)(Docket No. 42).

A recitation of the chronology of certain events and happenings assists in addressing the claims made by the defendant in this motion.

May 14, 2005 - The occurrence of the events giving rise to this prosecution and to the state prosecution referred to in the defendant's motions. (See Findings of Fact, supra, relating to defendant's Motion To Suppress Statements). Defendant arrested and charged in the Circuit Court of the City of St. Louis with the offenses of Murder First Degree and Armed Criminal Action.

February 21, 2007 - Defendant Yusef Tareek Stroud, acting pro se, filed a lawsuit in this court pursuant to 42 U.S.C. § 1983 alleging that the St. Louis City Police Department (sic), Officer Earley, Officer Scego, Detective Hanewinkle and Detective Campbell deprived him of his rights, privileges and immunities secured by the Constitution and laws of the United States based on the occurrences of May 14, 2005. (See Complaint, Cause No. 4:07CV359 SNLJ [hereinafter referred to as 'civil case'])(Docket No. 1).

April 12, 2007 - Answer and Motion To Dismiss Complaint in civil case filed by defendant City of St. Louis (Docket Nos. 7 & 8).

May 21, 2007 - Answer to Complaint in civil case filed by defendants Earley, Scego, Hanewinkle and Campbell (Docket No. 19).

September 17, 2007 - Motion of Defendant City of St. Louis To Dismiss Complaint granted and defendant City of St. Louis dismissed as party with prejudice in civil case (Docket No. 20).

February 14, 2008 - Yusef Tareek Stroud found not guilty on charges of Murder First Degree and Armed Criminal Action in Circuit Court of City of St. Louis.

March 5, 2008 - United States Attorney's Office Case Initiation Form prepared for case based on events of May 14, 2005 (hereinafter referred to as federal criminal case).

March 7, 2008 - Federal criminal case file opened in United States Attorney's Office and assigned to Assistant United States Attorney.

July 16, 2008 - Attorney James W. Schottel, Jr. enters appearance as attorney of record for plaintiff in civil case (Docket No. 26).

July 18, 2008 - Motion For Leave To File First Amended Complaint filed by plaintiff in civil case (Docket No. 27).

July 29, 2008 - Motion For Leave To File First Amended Complaint in civil case granted (Docket No. 29), and First Amended Complaint filed, naming Board of Police Commissioners, Officers Earley and Hanewinkle as defendants (Docket No. 30).

September 23, 2008 - Final Draft of Request for "Petite" policy waiver submitted by United States Attorney's Office to Department of Justice.

September 29, 2008 - Motion To Dismiss Complaint filed by defendant Board of Police Commissioners in civil case (Docket No.

48). Motion For Leave To File Answer To First Amended Complaint by defendants Early and Hanewinkle in civil case (Docket No. 46).

September 30, 2008 - Motion For Leave To File Answer To First Amended Complaint by defendants Earley and Hanewinkle granted (Docket Text Order), and Answer filed (Docket No. 50).

October 14, 2008 - Plaintiff's Motion To Add Parties And/Or File Second Amended Complaint filed in civil case (Docket No. 52), and (same) Motion granted (Docket Text Order).

October 16, 2008 - Plaintiff's Second Amended Complaint filed in civil case (Docket No. 53), naming as defendants individual members of Board of Police Commissioners (defendants Goodson, Hunter, Epsten, Bommarito, Slay and Nocchiero).

November 6, 2008 - Request for "Petite" policy waiver granted by Department of Justice.

December 11, 2008 - Indictment filed instant in federal criminal case.

December 15, 2008 - Answer to Second Amended Complaint filed in civil case by defendant Board of Police Commissioners and individual named board member defendants (Docket No. 63).[4]

At a hearing before the undersigned on the defendant's motion the Assistant United States Attorney prosecuting this case

---

[4]This chronology of events is taken from evidence before the court offered at the hearings on the defendant's motions, from this court's own records, and from uncontested factual assertions made by the parties in filings submitted to the court.

offered the following additional information by way of proffer, with the agreement of counsel for the defendant.

The matter was first referred to the United States Attorney's Office for prosecution in March, 2008. The case initiation form prepared on March 5, 2008, set out a brief summary of the facts of the case. It also noted that the defendant was acquitted of the murder charge in state court. It also noted that the defendant has two prior felony convictions for federal crimes. An application was prepared and submitted to officials in the Department of Justice (hereinafter Department) for a waiver of the Department's "Petite Policy." The application submitted on September 23, 2008, was a final draft and there may have been other drafts/applications submitted earlier upon which additional information was requested by the Department. As a matter of policy, the United States Attorney's Office would not have undertaken a prosecution of the defendant for being a felon in possession of a firearm while the defendant was charged in a pending state case with the offense of Murder First Degree in which a possible penalty of life imprisonment could be imposed and both of which offenses arose out of the same operative facts, nor would the United States Attorney's Office initiate the felon in possession prosecution had the defendant been convicted of Murder and had received a substantial sentence.[5]

_____

[5]At the hearing on the defendant's Motion To Dismiss the Assistant United States Attorney offered certain evidence by way of

In his first claim in support of his motion the defendant asserts that his prosecution in the instant case is vindictive and brought on account of his filing and pursuit of the civil action noted above.

Prosecutors have wide discretion in charging decisions. "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978). However, a decision to prosecute may not be based on, or motivated by, a desire to retaliate against a defendant on account of his having exercised some legal right. "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort . . . and for [a prosecutor] to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is 'patently unconstitutional'". Id. at 363. (internal citation omitted.)

"A defendant may demonstrate prosecutorial vindictiveness in two ways. . . . First, a defendant may prove through objective evidence that the prosecutor's decision was intended to punish him

_____

oral proffer. Counsel for the defendant agreed to proceed in such fashion. At the hearing the government agreed to permit the defendant to examine, and produced for the defendant to examine, the Case Initiation Form, Application for "Petite" policy waiver, and Approval of "Petite" policy waiver form referred to herein.

or her for the exercise of a legal right. . . . Second, a defendant may in certain circumstances rely on a presumption of vindictiveness." United States v. Beede, 974 F.2d 948, 951 (8th Cir. 1992)(internal citations omitted).

The defendant asserts that a presumption of vindictiveness is applicable in this case. He claims that the presumption arises out of the fact of his filing of the civil lawsuit against the Board of Police Commissioners and Officers Earley and Hanewinkle and the proximity of certain occurrences in the civil case and this criminal case. These circumstances, however, are insufficient to give rise to a presumption of a vindictive criminal prosecution. In United States v. Gilbert, 266 F.3d 1180 (9th Cir. 2001) the defendant was prosecuted for criminal tax violations. The prosecution followed the defendant's prior successful civil lawsuit against the Internal Revenue Service (IRS). The defendant also elicited testimony from two former IRS agents that his prosecution breached express IRS policy protocols governing criminal investigations. The court held that in these circumstances there was "no evidence giving rise to a presumption of vindictiveness". Id. at 1186. Likewise, in United States v. Branch, 91 F.3d 699 (5th Cir. 1996) the defendant sought dismissal of a federal indictment for being a felon in possession of a firearm after his acquittal in state court of the offense of murder arising out of the same operative facts giving rise to the federal

charges, and after he had filed a grievance with the Texas State Bar against two prosecutors who had prosecuted the murder case, and as a result of which the State Bar grievance committee found misconduct on the part of the prosecutors. The court held that the defendant had "failed to demonstrate that circumstances warranting a presumption of vindictiveness" existed in the case. Id. at 698. The court noted that the federal prosecutors had no knowledge of the grievance proceeding prior to seeking the federal indictment. Id. at 699.

The fact that the prosecution here was instituted following the defendant's acquittal in state court and while his civil lawsuit was pending and progressing is insufficient to raise a presumption of vindictiveness. And as in Branch, supra, there is no evidence before this court that federal prosecutors were even aware of the pending civil lawsuit at the time that the federal charges were brought. Nor has the defendant produced any objective evidence of vindictive prosecution and the indictment should not be dismissed on such grounds.

The burden of proving vindictive prosecution is on the defendant and the burden is a "heavy one." United States v. Leathers, 354 F.3d 955, 961 (8th Cir. 2004). The defendant has not met this burden here and the indictment should not be dismissed on such grounds.

As his second ground to dismiss the indictment the defendant asserts that the federal prosecution is merely a sham for state prosecution because the state failed to obtain a conviction on state charges and is retaliatory for his having filed the civil lawsuit referred to above. In asserting the claim the defendant cites to an Eighth Circuit case, United States v. Al-Muqsit, 191 F.3d 928 (8th Cir. 1999).[6] In that case several defendants were charged with various federal firearms offenses. Several of the charges arose out of and were related to the robbery of a retail gun store in Minnesota during which two store clerks were shot and killed. One of the defendants in the Muqsit case, Benjamin Matthew Logan, was charged and tried in a Minnesota state court for the offense of murder relating to gun store robbery. He was initially convicted of the murder offense but the conviction was overturned. Logan was then retried and was acquitted of the murder charge. Following the state court acquittal Logan was charged with the firearms offenses in federal court and was convicted of those offenses. On appeal Logan claimed, as does the defendant here, that the federal prosecution was a "sham" designed to vindicate the state court's interest in obtaining a conviction. Id. at 939. In addressing Logan's claims the Court noted certain principles of law applicable in its analysis.

_____

[6]The defendant cites the case as United States v. Wahid. It appears that "Wahid" is defendant Abdul Wahid Al-Muqsit's middle name. The case is captioned in the official West Federal Reporter as United States v. Al-Muqsit.

As a general matter, of course, prosecution by multiple sovereigns poses no constitutional difficulty. <u>See</u> <u>Heath v. Alabama</u>, 474 U.S. 82, 88, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985) ("When a defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct 'offences.'" (quoting <u>United States v. Lanza</u>, 260 U.S. 377, 382, 43 S.Ct. 141, 67 L.Ed. 314 (1922))). However, where the federal prosecution was merely a sham for state prosecution because it either vindicates interests that the state could not itself advance or is suggestive of collusion on the part of state and federal prosecutors, the dual sovereignty doctrine does not apply. <u>See</u> <u>United States v. Williams</u>, 104 F.3d 213, 216 (8th Cir. 1997).

<u>Id.</u>

The Court then went on to reject the "sham" prosecution argument noting that,

[The] argument ignores that the obvious interest of the federal government in prosecuting interstate trafficking of firearms exists entirely independently of Minnesota's interest in obtaining a conviction for felony murder. As to the alleged collusion between federal and state officials, it is well established that "cooperation between state and federal authorities does not amount to unlawful collusion." <u>Williams</u>, 104 F.3d at 216. Although we have recognized that at some point coordination between independent sovereigns may support an allegation of sham prosecution, this case presents no occasion to demarcate that line.

<u>Id.</u>

The same holds true here. <u>See</u> <u>also</u>, <u>United States v. Talley</u>, 16 F.3d 972, 974-75 (8th Cir. 1994); <u>United States v. Basile</u>, 109 F.3d 1304, 1306-07 (8th Cir.), <u>cert. denied</u>, 522 U.S. 873 (1997); <u>United</u>

States v. Leathers, 354 F.3d 955, 959-61 (8th Cir. 2004). (Each rejecting a claim of "sham" federal prosecution following either conviction or acquittal on related state charges). The burden is upon the defendant to show that the subsequent prosecution is a "sham". United States v. Koon, 34 F.3d 1416, 1439 (9th Cir. 1994) reversed on other grounds, 518 U.S. 81 (1996). The defendant has not met that burden in this case and the indictment should not be dismissed on such grounds.

In his third claim in support of his motion the defendant claims that the government has violated its own "Petite" policy.

The "Petite" policy is an internal Department of Justice policy stating that no federal prosecution should be based on substantially the same acts as were the basis for a prior state prosecution unless there is some compelling federal interest in a subsequent prosecution. United States v. Larsen, 427 F.3d 1091, 1094 (8th Cir. 2005). In order to institute a prosecution in such circumstances, authorization must first be obtained from an appropriate official of the Department of Justice. United States v. Basile, supra, 109 F.3d at 1308; United States v. Leathers, supra, 354 F.3d at 962 n.5. The policy does not confer any substantive rights on a criminal defendant, and a violation of the policy is not grounds upon which to dismiss an indictment. Id. See also, United States v. Talley, supra, 16 F.3d at 974-75 n.4; United States v. Basile, supra.

Further, the defendant's claim is refuted by the evidence before the court showing that the prosecution in this case was undertaken in compliance with the policy and with approval of the Department of Justice.

Therefore, the indictment cannot be dismissed based on defendant's claimed violation of the "Petite" policy.

As his fourth claim for dismissal of the indictment the defendant asserts that this prosecution for being a felon in possession of a firearm violates the Double Jeopardy Clause of the Fifth Amendment because he has already been prosecuted and acquitted by authorities for what he claims is the same offense.

A federal prosecution following a state prosecution for the same offense does not violate the Double Jeopardy Clause of the Fifth Amendment. United States v. Lanza, 260 U.S. 377 (1922); Abbate v. United States, 359 U.S. 187 (1959); United States v. Basile, 109 F.3d 1304, 1306 (8th Cir.), cert. denied, 522 U.S. 873 (1997); ("It has long been the law under the doctrine of dual sovereignty that federal prosecution following state prosecution 'of the same person for the same acts' does not violate the defendant's criminal rights.") United States v. Johnson, 169 F.3d 1092, 1095-96 (8th Cir. 1999) (same). The defendant acknowledges in his Memorandum In Support of his Motion To Dismiss that United States Supreme Court and Eighth Circuit Court of Appeals jurisprudence is contrary to the claims made in his motion but

states that he makes the claim to preserve his position for appeal.

The defendant's Double Jeopardy claim is not supported in law and cannot serve a basis for dismissal of the indictment.

As his fifth and last claim to dismiss the indictment the defendant asserts that the doctrine of collateral estoppel bars the relitigation of the issue of whether he possessed a gun inasmuch as he was acquitted of the charge of armed criminal action in the related state prosecution.

"The doctrine of collateral estoppel, or issue preclusion, provides that when an issue of ultimate fact has been determined by a valid and final judgment, that issue cannot be litigated between the same parties in another lawsuit." United States v. Brekke, 97 F.3d 1043, 1049 (8th Cir. 1996). In United States v. Kummer, 15 F.3d 1455 (8th Cir. 1994), the defendant claimed that his federal prosecution for various drug offenses was barred by the doctrine of collateral estoppel because the Supreme Court of North Dakota ruled, in a state prosecution based on the same facts giving rise to the federal prosecution, that the defendant had been entrapped as a matter of law. The court rejected the collateral estoppel claim noting that, "The collateral estoppel and res judicata doctrines do not apply when different sovereigns and, thus, different parties are involved in criminal litigation." Id. at 1461.

Moreover, the issue of the defendant's possession of a firearm was not necessarily litigated in the prior state criminal proceeding. §571.015, R.S.Mo. defines the offense of Armed Criminal Action as follows: "[A]ny person who commits any (non-excepted) felony under the laws of this state by, with or through the use, assistance, or aid of a dangerous instrument or deadly weapon is also guilty of the crime of armed criminal action . . ." Once the jury found the defendant not guilty of murder, they could not lawfully find him guilty of armed criminal action. State v. Peters, 855 S.W.2d 345, 348 (Mo.Sup.Ct. 1993), cert. denied, 510 U.S. 1075 (1994). The jury could have found the evidence insufficient to convict the defendant of murder, and thus found him not guilty of armed criminal action, without ever having considered whether he actually possessed the firearm, one of the matters at issue in this case.

For these reasons the doctrine of collateral estoppel is not applicable here and serves as no basis upon which to dismiss the indictment.

## Conclusion

For all of the foregoing reasons, the defendant's Motion To Dismiss should be denied.

Accordingly,

**IT IS HEREBY RECOMMENDED** that defendant's Motion To Suppress Statements (Docket No. 19) be denied.

**IT IS FURTHER RECOMMENDED** that defendant's Motion To Dismiss (Docket No. 41) be denied.

The parties are advised that they have until **Wednesday, February 10, 2010,** in which to file written objections to this Report and Recommendation. Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

*Frederick R. Buckles*
_____
UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of January, 2010.